# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 17-0570V
UNPUBLISHED

| | |
|---|---|
| GINA CEGIELSKI,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: March 16, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*

*Jennifer Leigh Reynaud, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

On April 26, 2017, Gina Cegielski filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered Guillain Barré syndrome (GBS) resulting from the administration of an influenza ("flu") vaccine on October 12, 2015. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Although Respondent conceded entitlement, the parties could not agree to damages, so the disputed components were briefed and argued at the February 2021

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Motions Day. For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount $**189,243.58, representing compensation in the amount of** $**180,000.00 for actual pain and suffering,** $**2,056.45 for past unreimbursable expenses, and** $**7,187.13 in lost wages**.

## I.       Relevant Procedural History

This case was initiated in 2017, and Respondent filed a Rule 4 Report conceding entitlement on January 2, 2018. ECF 21. The parties then attempted to informally resolve the issue of damages for over a year. Their discussions included OSM-mandated alternative dispute resolution before a third-party neutral – but this effort proved unavailing. ECF 56, 65.

I subsequently ordered the parties to file briefs on damages, and they attempted again to settle damages, but could not do so. ECF 78.I therefore scheduled this matter for an expedited hearing and ruling based upon all the evidence filed to date and the parties' briefing. ECF 79. The hearing was held on February 26, 2021.[3] Petitioner requests that I award her $250,000.00 for past and future pain and suffering. ECF 72. Respondent proposes that I award the lesser amount of $100,000.00. ECF 71. The parties do not dispute that $2,056.45 in past unreimbursable expenses and $7,187.13 in lost wages should be awarded, so the only issue for resolution is pain and suffering.

## II.      Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

---

[3] An official recording of the proceeding was taken by court reporter. A link to instructions on the court's website detailing how to order a certified transcript or audio recording of the proceeding can be found in the Minute Entry dated February 26, 2021. *See also* www.uscfc.uscourts.gov/trans (last visited March 4, 2021).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Prior pain and suffering awards in comparable cases also bear on the findings reached herein. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

## III.    Appropriate Compensation in this Case

In this case, awareness of the injury is not disputed, leaving only the severity and duration of Petitioner's injury to be resolved. In performing this analysis, I have reviewed the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents and at the expedited hearing held on February 26, 2021. I also considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience in adjudicating those cases. However, I ultimately base my determination on the circumstances of this case.

Here, the record shows that Petitioner, a phlebotomist, received a flu vaccine on October 12, 2015. Ex 1. At a consultation with a neurologist on November 23, 2015, Petitioner reported continuous numbness and tingling in her fingers and lower extremities for the past two weeks. Ex 6 at 49. During a follow-up appointment on December 7, 2015,

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Petitioner complained of worsening weakness in her extremities and difficulty walking. *Id*. at 47. After an EMG/NCS showed findings consistent with GBS, Petitioner was admitted to the hospital for inpatient IVIG treatment from December 9-11, 2015. *Id*. at 47, 71; Ex 8. She received the remainder of her IVIG treatments as an outpatient. Ex 8 at 11.

Petitioner then began physical therapy (PT) on February 29, 2016. Ex 5. At her initial evaluation, Petitioner reported that she was not taking any medication for her GBS and that she had returned to work. *Id*. at 2. While she reported mild pain with activities of daily living, she also stated that her symptoms were not affecting her work performance. *Id*. at 3. She attended three PT sessions and stopped after "injuring another body part." Ex 5.

While the record is unclear what "body part" Petitioner was referencing in her PT discharge notes, in April 2016 Petitioner presented to Dr. Stuart Styles, an orthopedic surgeon, with complaints of right shoulder pain after a fall. Ex 4 at 4, 6. An MRI performed in May 2016 demonstrated tears of the infra and supraspinatus tendons. *Id*. at 14. Dr. Styles noted that while Petitioner had a prior history of right shoulder impingement,[5] an MRI performed one year earlier had shown right rotator cuff tendinopathy but no tear. *Id*. at 3, 13, 15. Dr. Styles opined that Petitioner's "history of [GBS] clearly appears to be a . . . provocative factor" in causing the tendon tears and muscle atrophy in her right shoulder. *Id*. at 2. After two steroid injections were unsuccessful in alleviating Petitioner's pain, she underwent surgical right rotator cuff reconstruction on October 14, 2016. *Id*. at 3, 6, 25. Petitioner then attended 47 sessions of post-surgical PT from mid-November 2016 through March 2017. Ex 10.

During Petitioner's recovery from her shoulder surgery, she attended her final follow-up appointment with her neurologist in February 2017. Ex 12 at 1. At that time, neurologic examination revealed normal findings, except for decreased sensation in the fingertips, 4/5 strength in the left toes, and decreased muscle bulk in the muscles used to abduct the thumb. *Id*. Petitioner also continued to improve from an orthopedic standpoint. Ex 13 at 8. She did receive cortisone injections in her right shoulder in May and July 2018, and as of September 2018, Petitioner reported that she was "doing quite well." *Id*. at 1, 5. Examination at that time showed some adhesive capsulitis and "significant loss of bulk of the supra and infraspinatus muscles." *Id*.; Ex 14 at 1.

After a one-year gap in treatment,[6] Petitioner returned to Dr. Styles in September

---

[5] *See, e.g.,* notes from Dr. Styles dated March 31, 2015, six months prior to vaccination, which reflect that Petitioner had a "long history of right shoulder pain. Ex 4 at 8. Petitioner received a cortisone injection in the March 31, 2015 visit and reported 50 percent improvement at a follow-up appointment three weeks later. *Id*. at 7. There are no additional records related to Petitioner's right shoulder prior to April 2016.

[6] For any musculoskeletal or neurologic complaints.

2019 with complaints of continued pain and reduced range of motion in her right shoulder. Ex 14 at 2. One month later, Petitioner presented to her primary care physician (PCP), reporting a "recurrence . . . of fingertip paresthesias and numbness." Ex 15 at 1. This was the first time she had reported any neurologic symptoms in over two years. On examination, Petitioner had no gross motor or sensory deficits in either hand. *Id*. at 2.

There are no additional treatment records in the file. However, Petitioner also submitted a letter from Dr. Styles, dated September 2020, in which he opines that "the primary cause of [Petitioner's] shoulder pathology is [GBS] that led to significant weakness in her rotator cuff and ultimately a large tear." Ex 22 at 1.

In her most recent affidavit, dated May 2020, Petitioner reported continued anxiety and insomnia from her concerns about how her physical functioning may be impacted in the future. Ex 17. She is fearful about adverse effects of vaccines she may be required to receive in the future as part of her employment as a healthcare provider. *Id*. Petitioner also submitted affidavits from a friend, her two adult sons, and her daughter, who was a teenager at the time of Petitioner's diagnosis. They all reported anxiety related to Petitioner's illness and described their fear surrounding her recovery.[7] Exs 18-21.

As I informed the parties during the expedited hearing, the question in this case is not whether Ms. Cegielski is entitled to *any* compensation for her pain and suffering, but rather *what* amount of compensation is justified, based upon the facts of the case. This determination is not an exact science but more of an art. While it is tempting to "split the difference" and award an amount halfway between the amounts proposed by the parties (based upon the reasonable supposition that the parties' respective positions "frame" high and low potential awards), each petitioner deserves an examination of the specific facts in his or her case. Thus, while the amounts ultimately awarded may end up falling somewhere in that range, the determination ultimately flows from a specific analysis of Ms. Cegielski's personal circumstances.

In her brief, Petitioner argues that her case is unique, since it involves both a direct-caused GBS injury but also features a related, "SIRVA-type" shoulder injury. ECF 72. As a result, Petitioner seeks an especially high pain and suffering award in a SIRVA case, at the statutory $250,000.00 "cap." In so requesting, Petitioner argues that her award should be fashioned as a combination of the results in (1) *Dillenbeck*[8] ($170,000.00 in actual

---

[7] In both her and her sons' affidavits, Petitioner alleged that she could not ambulate, and relied on her sons to carry her around the house during the acute phase of her illness. While Petitioner's children were understandably concerned about her illness, however, the treatment notes do not reflect a complete inability to ambulate, even while Petitioner was hospitalized. *See, e.g.*, Ex 8 at 20.

[8] *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), *aff'd in relevant part* 147 Fed. Cl. 131, 2020 WL 582588 (2020).

pain and suffering for GBS, plus a future component), and (2) *Collado*[9] (awarding $120,000.00 in actual pain and suffering for SIRVA), thereby exceeding the cap. *Id*.

Respondent counters that Petitioner should be awarded the much lesser sum of $100,000.00 in total pain and suffering. ECF 71. In his brief, Respondent also references *Dillenbeck*, as well as *Presley*[10] and *Johnson*,[11] arguing that the sequela suffered by those petitioners was longer lasting and more severe than that experienced by Ms. Cegielski. ECF 71. Respondent also acknowledges that Petitioner's history of GBS *complicated* her recovery from shoulder surgery but maintains that Petitioner's shoulder injury is not otherwise causally connected to her GBS. *Id*.

After reviewing the record in this case and considering the parties' arguments during the hearing, I agree with Petitioner's contention that the present facts are not directly comparable to other GBS or SIRVA claims – but this determination does not totally cut in her favor. Her acute GBS was relatively mild, for example, when compared other cases in the Program. Petitioner was hospitalized for three days, whereas the petitioner in *Francesco*[12] was hospitalized for eight days and treated at an inpatient rehabilitation facility for 22 additional days. *Francesco* 2020 WL 6705564 at *2. The petitioners in *Fedewa*[13] and *Devlin*[14] were also each hospitalized for over a week. Furthermore, Petitioner's ongoing sequelae were relatively mild, and she was able to return to work not long after her hospitalization, as was the case in *W.B.*[15]

In fact, while Petitioner reports that she continues to have intermittent numbness in her fingertips that interferes with her ability to do her job, this is inconsistent with the medical evidence. For example, less than three months after her discharge from the hospital, Petitioner reported that her symptoms were not affecting her work performance.

---

[9] *Collado v. Sec'y of Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018).

[10] *Presley v. Sec'y of Health & Human Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. March 23, 2020) (awarding $180,000.00 in actual pain and suffering for GBS).

[11] *Johnson v. Sec'y of Health & Human Servs.*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 in pain and suffering for GBS).

[12] *Francesco v. Sec'y of Health & Human Servs.*, No. 18-1622V, 2020 WL 6705564 (Fed. Cl. Spec. Mstr. Oct. 15, 2020) (awarding $165,000.00 in pain and suffering for GBS).

[13] *Fedewa* 2020 WL 1915138 at *3.

[14] *Devlin* 2020 WL 5512505 at *3.

[15] *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1634V (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $155,000.00 for pain and suffering for GBS).

Ex 5 at 3. Further, while Petitioner complained to her PCP in October 2019 of fingertip paresthesias and numbness, examination showed no gross motor or sensory deficits in either hand. Ex 15 at 2. And she has not sought out neurologic treatment since that date.

As for Petitioner's shoulder, the record best supports the conclusion that it reflects an indirect sequela of her GBS, rather than a discrete direct injury, and therefore pain and suffering awarded in response to it should be somewhat more modest than what Petitioner demands. Petitioner's counsel admitted at hearing that the fall that was the immediate cause of the shoulder injury was not *itself* directly attributable to GBS. While Dr. Styles's 2020 letter does support a conclusion that Petitioner's GBS prolonged Petitioner's recovery from shoulder surgery, he is an orthopedist, not a neurologist, and has not provided direct evidence of causation. When considering both Petitioner's GBS and the extended recovery from her shoulder surgery, this case is somewhat comparable to *Dillenbeck*. While the petitioner in *Dillenbeck* had a more severe case of GBS, she continued to experience symptoms long after her recovery from the acute phase of her GBS, similar to Petitioner's continued shoulder pain.

In sum, when balancing Petitioner's comparably minor case of GBS with her more complicated recovery from shoulder surgery and considering the arguments presented by both parties at the hearing, a review of the relevant caselaw, and the written record, I find that $180,000.00 in total compensation for actual pain and suffering is reasonable in this case. This actual award exceeds those in some of the referenced comparable cases, and takes into account the discrete injuries Petitioner suffered that relate to her GBS, but also is scaled to reflect the fact that the direct GBS itself did not require significant or lengthy medical treatment.

The resolution of pain and suffering in this case took far longer to resolve than the case actually required. While some of the delay is attributable to the parties' participation of the now-discontinued OSM mandatory mediation program, overall, this appears to be a case where the parties simply "dug in" to their respective positions. This is not acceptable for SPU matters, and counsel are therefore urged in the future when faced with conceded cases to adopt more flexible and constructive settlement positions.

## IV.     Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $180,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[16] I also find that Petitioner**

---

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V,

is entitled to **$2,056.45 in actual unreimbursable expenses and $7,187.13 in lost wages.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $189,243.58 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[17]

**IT IS SO ORDERED.**

> **s/Brian H. Corcoran**
> Brian H. Corcoran
> Chief Special Master

---

1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.